SIMPSON ADVERTISING SERVICE COMPANY, a Corporation, v. MANUFAC-
TURERS' AND MERCHANTS' ASSOCIATION OF ST. LOUIS, a Corpora-
TION, Appellant.—51 S. W. (2d) 1019.

Division Two, July 1, 1932.

1050

*Carter, Jones & Turney, James E. Garstang* and *Richard S. Bull* for appellant.

*Taylor, Chasnoff & Willson* and *James V. Frank* for respondent.

·WHITE, P. J.—The plaintiff brought suit in *quantum meruit*, alleging that about January 15, 1927, "at the special instance and request of the defendant he furnished to and for the benefit of the defendant certain services, materials and finished products in the creation, designing and manufacture for the defendant of an industrial poster programme including . . . one thousand sets of specially designed posters, consisting of 52 posters in each set, and a specially designed frame in which each set was encased, together with appropriate booklets, circulars and advertising matter;" that the reasonable value of the service, labor and material furnished was $20,806.94. Plaintiff acknowledged a credit of $1,940, leaving a balance of $18,866.94, for which judgment was asked.

The defendant, after general denial, alleged that it did enter into an agreement whereby the defendant was to assist plaintiff in the sale of plaintiff's posters and that the defendant made collections from time to time to cover such sales and accounted to plaintiff therefor, and that there was a balance due the plaintiff of $336.40, after deducting the commissions and other amounts due plaintiff, which amount was tendered by the defendant.

The reply was a general denial.

From a judgment upon a jury's verdict for $8,060 defendant appealed.

The defendant was an association of owners of manufacturing plants. Plaintiff, Simpson Advertising Company, was represented by Roy B. Simpson, its president and manager. Plaintiff's case was made out largely on his testimony. He testified that about the middle of January, 1927, Mr. Lloyd Scruggs, a friend, and a member of the board of directors of the defendant Association discussed with

him the Bill Jones posters. The president and general manager of the defendant Association was Mr. Herbert Hausman who, with Scruggs, had been considering a poster programme for some time. Simpson attended a meeting of the board of directors of the Association February 27, 1927, at Hotel Chase, at which meeting about twenty-five men were present: He was introduced to the Association by Mr. Hausman and explained his sketches and the poster programme.

At that meeting he made his "proposition," one thousand sets of posters at ten dollars a set. These posters were to be displayed in the factories of the members who purchased them and the purpose was explained in a letter March 26th by Mr. Simpson to Mr. Hausman as follows:

"The purpose of this plan is to raise up a new and higher idealism among factory workers. These posters do far more than the personal talks by officials to correct tendencies and habits which have been years in forming. The worst enemies of the manufacturer are laziness, carelessness, loafing, wastefulness, disloyalty, knocking and gossiping. All are costly habits, but they can be corrected with M and M Industrial Posters."

The effect of those preachments was, no doubt, to make the employees *good* and render more efficient and faithful service.

Simpson testified that after the meeting was adjourned one of the directors told him the board had accepted his proposition. Afterwards he urged Mr. Hausman to give him a written order. Mr. Hausman objected, saying he could not sign such an order; he could not obligate his association to pay ten thousand dollars for something until he knew what was going to be delivered; the sketches must be approved by the board before he would sign an order. Simpson explained to Mr. Hausman that it would involve a lot of money to have the drawings made, to buy paper and plates and frames. And Mr. Hausman then said:

" 'Why you don't think this Association of honorable, responsible business men would let you lose any money?'

"And to make it more emphatic he said, 'I will personally go out and go to these members before I would let you lose any time.' "

Upon that Simpson went ahead with his programme. He explained that he would get up five or six "subjects" and take them to Mr. Hausman who would take a few at a time and work them over. Hausman had a committee to whom he submitted them. Simpson had to get up a number of pencil sketches; he called in artists, "lead-out men." In that way they accumulated fifty-two which were then submitted to the board for approval. The witness went into detail.

Plaintiff introduced Exhibit 2, apparently circulated by the association. The symbol at the top of Exhibit 2 was an emblem of the

Merchants' and Manufacturers' Association, defendant. It stated that for several months the association had had in process the preparation of the poster plan; that the most careful research and study had been employed in developing the best series and it believed that the programme would prove of inestimable value to the members.

Plaintiff also introduced Exhibit 3, a bulletin of the defendant which contained the following:

"The newly-created Industrial Poster Program of the Association, the details of which were announced to our members recently by personal communication, is being received with the greatest enthusiasm and interest, and the orders already received from members exceed the fondest expectations of the directors and officers.

"The large number of orders received for multiple sets of these posters indicates that many plants will make quite a general display of the posters in their various departments. May we remind those members who have not already done so to estimate their requirements and advise us of the number of sets they desire?"

Witness Simpson explained the posters, the work and expense employed in making them, and said that he discussed the matter with Mr. Hausman who knew how many sets, 52 posters to a set, were to be furnished. He said that the total expenditure paid out by Simpson Advertising Company, or for which obligations were incurred, amounted to $9,606.57.

Plaintiff also introduced Exhibit 6, over the signature of Mr. Hausman, a letter addressed to one whose name could not be used without embarrassing the recipient, as follows:

"April 20th, 1927.

"My dear Mr.

"You have been previously advised about the Association's New Industrial Poster Program. The purpose of these posters is to improve the happiness, thrift, efficiency, loyalty and individual merit of the men and women in the offices and plants of our members.

"This plan has been completed. A set of 52 copyrighted posters has been produced. In quality, attractiveness and general usefulness they greatly surpass anything of the kind we have ever seen. To prove this statement, may we draw your attention to the enclosed small reproduction and the list of attributes covered.

"This unusual and desirable set of posters was presented to the board of directors of the Association and by unanimous vote the whole plan was approved and adopted."

I. Simpson in his testimony said that one of the directors of the defendant said to the vice-president, a Mr. Beckemeyer:

"You know we have bought a thousand sets of posters."

1056

This was objected to and its admission is assigned as error on the ground that the knowledge of an officer of a corporation "received in a transaction affecting them (the officers) privately and outside the range of official business is not binding upon a corporation," and

It was incompetent as an admission because the expression of an opinion, related to a past event and was a declaration outside the scope of declarant's authority.

The statement objected to was made, as respondent claims, by Mr. Lloyd Scruggs, chairman of the poster committee of the defendant association, to Mr. Beckemeyer, a director and vice-president of the defendant association, and president of the Gravois Planing Mill, a member of the association. Appellant denies there was any evidence that Scruggs was the director who made the statement to Beckemeyer. He points to a passage from the testimony of Mr. Simpson where this occurred:

"Q. Mr. Beckemeyer, who was down at the Gravois Planing Mill and to whom Mr. Scruggs told they had bought a thousand sets from you, does he live here? A. Yes, sir."

Appellant argues that this is not evidence that Scruggs was the director who made the statement to Beckemeyer. It is not unless it might be said that the answer "yes sir" includes an affirmative answer to everything implied in the question. On cross-examination by defendant's counsel Mr. Simpson said that he was not familiar with the posters until the association, (meaning the defendant) brought him into the matter, and he was invited to collaborate with them on the poster programme, then the following:

"Q. I want to know how that was done. Who was it that did that? A. They invited me in.

"Q. Just a minute. Who did it . . . who invited you? A. Mr. Lloyd Scruggs."

Then, in relating the circumstances which called forth the statement objected to, the witness testified:

"Q. What was said to him (Beckemeyer) if anything, about the poster programme when you ordered the frames from him? A. Well, one of the directors *who got me into it* took me down to see Mr. Beckemeyer and introduced me. I had never met him . . . and he said 'Beckemeyer' he said 'you know we bought a thousand sets of posters.'"

Thus the witness said that the director who made this statement to Beckemeyer was the one who "got me into" the scheme and on cross-examination explained that Scruggs was the director who got him into it. The witness had already explained that through Scruggs he began his negotiations with the defendant.

So then the statement made by Scruggs to the vice-president was the statement of the agent in charge of that particular business, chair-

man of the posters committee of the defendant, who knew the conditions of the arrangement between plaintiff and the association. It was his particular business to know. The statement of Scruggs was an admission of defendant. He was at the time about the very business of which he spoke. He was there and for the purpose of ordering the posters and the frames. [14a C. J. pp. 487-489.]

The point is made in appellant's brief that the statement of Scruggs to Beckemeyer was not notice to the corporation because Beckemeyer, in this particular transaction of furnishing the posters and frames was acting solely in his own interest for his own particular corporation which manufactured the frames. It is sufficient to say that that objection was not made at the time the evidence was offered. The only objection was this:

"I object to it unless it can be shown that this man (meaning Scruggs) had authority to speak for the organization."

Since Scruggs was about the business with which he was entrusted he had authority to speak for the corporation; his statement was admissible.

II. Appellant assigns error to the admission of a hearsay statement made by Mr. Carpenter, president of the defendant association. The incident occurred when Mr. Simpson, for plaintiff, testified as follows:

"Q. You didn't understand me. I say, after Mr. Hausman refused to sign the written confirmation did you discuss the matter of the association's obligation to you with its president, Mr. Carpenter? A. Yes; that was some time in September.

"Q. September what year? A. 1927.

"Q. And what did Mr. Carpenter say to you about it? A. Mr. Carpenter said that at the September meeting he made a proposal that the board of directors should buy fifty sets. He says, 'We owe Simpson this money,' and he says 'I think we ought to get him out.' No one accepted his proposal, but he personally sent us his check for fifty sets of posters, five hundred dollars. I then went to his office to thank him personally and he told me what he had done, and that he felt that we were—that the association was obligated to us and he did what he thought was his part in taking fifty additional sets more than he wanted for his own personal business.

"Q. Did he say what the association was obligated to you for?

"Mr. Garstang: Wait, I object to that.

"The Court: Wait a minute. I understand he is talking now about the president of the association?

"Mr. Garstang: Yes.

"The Court: Anything he says is binding.

"Mr. Garstang: I don't think so.

"THE COURT: That is where we differ. I think he is. The president is an executive manager.

"MR. GARSTANG: I realize that as well as anybody if he is acting within the scope of his authority, yes.

"THE COURT: I am going to rule that he has a right to testify what the president said.

"To which action and ruling by the court the defendant, by its counsel, then and there duly excepted at the time and still continues to except.

"A. I talked with Mr. Carpenter probably about fifteen or twenty minutes. I had never met him before and he said he made that proposal. One other director said he would take ten, but he didn't take them, and Mr. Carpenter was the only one of the directors in the association that bought in excess of their original requirements from Mr. Hausman. Mr. Carpenter, I think, originally bought fifty sets for his business, which he thought was all that his business needed.

"MR. WILLSON (Q.): What did he say about the association's obligation, if anything?

"MR. GARSTANG: I make the same objection.

"THE COURT: The same ruling.

"To which action and ruling by the court the defendant, by its counsel, then and there duly excepted at the time and still continues to except.

"A. He said I told the directors I thought we owed you for these posters, and if ten of us go together and take fifty sets each we will wipe the whole thing out. He said 'I made my proposal, I will stay by it and then I will make my check for five hundred and fifty for the fifty.' "

Mr. Carpenter was president and executive manager of the defendant. The objection implies that he was not acting within the scope of his authority when he made the statement objected to and we may consider it sufficiently formal.

The witness was asked if he discussed (with Mr. Carpenter) "the matter of the Association's obligation to you" (Simpson), and answered that Carpenter told witness he had said to his board: "We owe Simpson this money, I think we ought to get him out."

To the question and answer there was no objection.

Then followed the question:

"Did he say what the. Association was obligated to you for?"

It was objected to. Plainly, it merely called for an amplification of what had already gone on without objection. After a colloquy the answer was:

"He said, 'I told the directors I thought we owed you for these posters.' "

The objection urged here is that the answer was a mere expression of an opinion. Respondent correctly says the answer was not responsive to the question, which did not call for an opinion but for the facts. Defendant did not move to strike out the *answer*. Therefore the only errors which we can consider are those directed to the propriety of the question.

Appellant makes two such objections: one that it related, not to an impending transaction, but to a past one and was a declaration outside the scope of the declarant's authority made by him as an individual and not as an officer of defendant.

Mr. Simpson in his statement says he went to Carpenter's office to thank him personally for the $500 check, which Carpenter gave for additional sets that he wanted for his own personal use. It was after that statement that he was asked if Carpenter said what the association was obligated to Simpson for. Presumably that was at the same time. For this reason appellant argues that Simpson was there about the personal business of Carpenter and not about the business of the association. But the personal business was already ended. Simpson had received the check before he went. There was no other business to transact in relation to it. While there the conversation came up about the association's obligation. Mr. Carpenter testifies to the incident in this way:

"I think I was president of the association at the time. As I recall Mr. Simpson came to my office. *He was very much upset because the Association had not agreed with him* to take over these posters and in doing so they would bind themselves for ten thousand dollars. He talked to me about that for some time in my office and he said he put a lot of money in it and it was not going like—it ought. *I think I told Simpson at the time what the results of the meetings were.*"

Plainly, if he told Mr. Simpson at the time what the result of the meetings were, he made the statement that Simpson swore to if he made it at all. So while Simpson did go to his office, he says to thank him for his check, he also had more important business. The matter of the failure of the association to comply with its agreement; he was upset about it. He complained to the president about it as a proper official to whom to make his complaint. It was about the Company's business in the scope of the president's authority to consider it and he made the statement while hearing the protest of Mr. Simpson in relation to it. While it was of a past event it related directly to the transaction under consideration and not to a completed transaction. There was no error, therefore, in receiving the evidence.

III. Appellant assigns error to the ruling of the court in refusing to admit in evidence defendant's Exhibit B, a letter dated

June 3, 1927, signed by Simpson Advertising Company, Roy B. Simpson, President, and addressed to the Merchants' and Manufacturers' Association. That letter is of great length, 12 numbered paragraphs, and related to the entire matter regarding the posters. The general effect of the letter was to modify any arrangement theretofore had between the parties and to make any payment for posters conditional upon a sale by defendant to its members. At the end of the letter is:

"Accepted June 10, 1927, Manufacturers and Merchants Association of St. Louis. By Herbert Hausman."

The plaintiff objected for several reasons, only one of which we need consider:

The action was in *quantum meruit* for certain posters which defendant agreed to buy from the plaintiff. The evidence of Mr. Simpson set out above regarding the meeting in February, 1927, when his proposition was discussed, shows the information given by one of the Board of Directors that the Board had accepted his proposition. There was delay in signing a contract, while Hausman encouraged him to go ahead with the drawings and purchase of supplies, assuring him that the association of honorable, responsible business men would not let him lose any money, on which assurance he went on with his contracts and had paid out in actual cash by July 30th, $9,650.57.

The witness testified that the job was completed about July 7th. He was asked when it was that Hausman first told him that the company would not sign a written contract, and said it was some time in May, but the money was all obligated for about the middle of March; the contracts were all made and Mr. Hausman knew that before he refused in May to sign the order. He knew that the contracts were being let and the money was spent. Hausman, however, told him that if he incurred any expense he would do it at his own risk, but that was in the middle of May after the money either was spent or the contracts made.

Exhibit B starts out with the statement that the great objective is to get an order for ten thousand posters from members of the association, according to a plan suggested. Then follows paragraph 2 with this statement:

"2. Of course you realize *that this is entirely different and apart from everything we have heretofore discussed* or proposed, with the exception that you will get your 250 sets on the same basis of $10 per set. Your order at the price of $10 per set will be accepted and deliveries will be made at this figure the moment we get definite orders from three other Associations for 250 sets each at $15 per set."

Then come a number of paragraphs regarding the plans and the method of conducting the campaign for the posters. Paragraphs 8 and 9 are as follows:

"8. This simply means that if you are unable to buy 1000 sets, or get three other associations to join you in buying this quantity, we will then take charge of the selling in St. Louis, and you will lose the difference between the $10 price and your selling price, but Your Members Will Get Their Posters For Only $15 Per Set.

"9. *It is a condition of this agreement* that in the event of a readjustment of prices as set forth in paragraph seven and sub-paragraphs A and B, your association will furnish us all information necessary to make such readjustment."

Paragraph 12 is as follows:

"12—This contract becomes effective on or before June 10, 1927, and will terminate on September 15, 1927, unless your association alone, or in cooperation with three other similar associations, have given us definite orders for 1000 sets or more at the prices specified in paragraph No. 2. In this event this contract will be extended for one year from date of acceptance."

The defendant made an offer of proof to show that this was the only contract or arrangement made between the defendant and the plaintiff for the purpose of selling the posters. It did not plead nor offer to prove that the terms of this alleged contract had been complied with by the association. There was no offer to prove that the condition mentioned in paragraph 9 was complied with or that anything whatever was done by the association in connection with it.

Paragraph 12 carried its own limitation; the arrangement would terminate September 15th unless the association alone, or in cooperation with three other associations, should have given defendant orders to the plaintiff for a thousand sets of posters. The association evidently recognized the expiration of the proposal in Exhibit B. It offered in evidence a portion of the minutes of the association of September 19th, as follows:

"Mr. Scruggs reviewed matters and details incident to the association's poster program, and outlined his activities in the matter as well as his statements to Mr. Simpson of the Simpson Advertising Company.

"There followed a general discussion of this matter, and Mr. Carter made the following motion:

" 'That the board of directors of the association to *not recognize any contractual relationship* with Roy B. Simpson, but do recognize Mr. Scruggs' situation, and that any action on the poster matter be deferred until the next meeting of the board;' motion seconded by Mr. Gillis, and carried."

The conditional end of the contract's life September 15th was thus either recognized, or it was repudiated, by the board of directors in that minute, resolving that it did not recognize any contractual relationship with Roy B. Simpson. The defendant also offered a minute

of October 28, 1927, "having to do with the board's action on contract dated June 3, 1927." Possibly that referred to the action of September 19th.

Objection of the plaintiff to the offer of this minute was sustained. Although the defendant assigns error to the refusal of that minute there was no offer of proof and it is not in the record. We are unable to say that the action of the court in that respect is erroneous. Therefore, so far as any record shows, the defendant did not recognize the alleged contract of June 3rd as being in force at any time.

Appellant suggests further that Exhibit B of June 3rd, accepted June 10th, constituted a contract, and that all prior negotiations and conversations were merged into the written contract which must determine the agreement. The doctrine of merger of prior negotiations applies only to executory contracts. [13 C. J. 598. sec. 617; Davis v. Culmer, 295 S. W. l. c. 805.] It must be executory on both sides.

In this connection the appellant asserts that the contract, the verbal arrangement could not have been fully executed except by payment prior to the date of the written contract, Exhibit B; that the first posters were not finished nor ready for delivery until after that date. Appellant is entirely correct as to that fact. But the expense had been incurred; the manufacture was partly complete when the agreement was repudiated and the plaintiff sued only in *quantum meruit* for the work actually done. Appellant in offering the minute referred to says in his brief that Exhibit B was the "agreement under which the parties worked." But there was no offer of proof that it was the agreement under which the parties worked, or that the defendant complied with any of its terms in order to make it a binding contract. Exhibit B was therefore properly excluded.

IV. Appellant claims that the court erred in refusing his demurrer to the evidence at the close of the whole case. The argument is based upon the theory that the alleged written contract of June 3rd, Exhibit B, controlled the matter and relieved the defendant from liability. Since we have held that the alleged contract was inadmissible the demurrer for like reason was properly overruled.

V. Appellant assigns error to the giving of Instruction 1, given on behalf of the plaintiff. Almost in the language of the petition it authorized the jury to find for the plaintiff if the plaintiff at the defendant's request and with the knowledge and consent of the defendant furnished the defendant certain services, materials and finished products in the creation and designing of the industrial posters programme, including the manufacture and designing of a thousand sets of such posters and advertising matter. The point is that the

instruction leaves out of consideration the defense offered by the association. The defense was Exhibit B, which would be a matter for the jury only in case it had been admitted as evidence of what the contract of the parties really was. Therefore that instruction was not erroneous for the reason assigned.

The judgment is affirmed. All concur.